## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| UNITED STATES, ) | |
| ) | |
| v. ) | Crim. No. 07-0152-04, 06 (ESH) |
| ) | |
| ERNEST MILTON GLOVER, ) | |
| HELERY R. PRICE, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## MEMORANDUM OPINION

Filing motions pursuant to 28 U.S.C. § 2255, Ernest Glover and Helery Price now seek to vacate their convictions for conspiracy to distribute phencyclidine ("PCP") on the basis that they have been deprived of their Sixth Amendment right to the effective assistance of counsel at trial and on appeal.  (*See* Glover's Mot. Under § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody, Oct. 28, 2013 [ECF No. 325] ("Glover Mot."); Price's Mot. Under § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody, Oct. 25, 2013 [ECF No. 329] ("Price Mot.").  The government opposes any relief.  For the reasons stated herein, both motions will be denied.[1]

_____

[1] In addition to defendants' motions, the Court has considered the following filings: Price's Supplement to his Previously Filed § 2255 Motion, Dec. 31, 2013 [ECF No. 336] ("Price Supp."); United States' Resp., Apr. 1, 2014 [ECF No. 349] ("1st Gov't Resp."); Glover's Supplemental Memorandum of Law in Support of § 2255 Motion, June 26, 2015 [ECF No. 364] ("Glover Supp."); United States' Resp., Sept. 4, 2015 [ECF No. 370] ("2d Gov't Resp."); Price's Reply to the Government's Opposition, Sept. 18, 2015 [ECF No. 371] ("Price Reply"); Memorandum of Amicus Curiae of the Federal Public Defender Office on Behalf of Ernest Milton Glover and Helery Price, Dec. 21, 2015 [ECF Nos. 386 & 387] ("Amicus Mem."); United States' Reply to the Amicus Mem., Jan. 20, 2016 [ECF No. 395] ("Gov't Reply"); and Petitioners' Joint Supplemental Memorandum in Reply to the Government's Response to

## BACKGROUND

After a jury trial, Glover and Price were each convicted of one count of conspiracy to possess with intent to distribute and to distribute one kilogram or more of PCP, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(iv) & 846.  (*See* Judgment (Glover), Aug. 11, 2008 [ECF No. 283]; Judgment (Price), Aug. 11, 2008 [ECF No. 277]).  Both were sentenced to imprisonment for life pursuant to the applicable statutory mandatory minimum,[2] and their convictions were affirmed on appeal.  *See United States v. Glover*, 681 F.3d 411 (D.C. Cir. 2012).  A co-defendant, Anthony Suggs, was also tried and convicted by the same jury, and the Court has previously denied his § 2255 motion.  *See United States v. Suggs*, No. 07-cr-0152, 2015 WL 7566658, at *12 (D.D.C. Nov. 24, 2015) ("*Suggs § 2255 Opinion*"), *appeal filed*, *United States v. Suggs*, No. 15-3092 (D.C. Cir. Dec. 30, 2015).  That opinion included an extensive background section, *see Suggs § 2255 Opinion* at *1-3, which the Court will not repeat here, but will proceed directly to the specific claims raised by Glover and Price.

In their § 2255 motions, Glover and Price raise multiple claims of ineffective assistance of counsel.  Those claims pertain to the following events:  (1) Glover's counsel's alleged failure to investigate and learn of his drug addiction; (2) Price's counsel's one-day absence from the courtroom during trial due to illness; (3) the admission into evidence of items seized during the June 19, 2007 search of Glover's residence; (4) the admission into evidence of five conversations

---

Amicus Filing, Feb. 4, 2016 [ECF No. 396] ("Joint Reply");

[2] Both Glover and Price had two prior felony convictions, subjecting them to sentences of mandatory life imprisonment.  *See* 21 U.S.C. § 841(b) (penalty for a violation of 21 U.S.C. § 841(a)] section involving one kilogram or more of PCP "[i]f any person commits such a violation . . . after two or more prior convictions for a felony drug offense have become final, such person shall be sentenced to a mandatory term of life imprisonment without release and fined in accordance with the preceding sentence").

recorded by the bug installed in alleged co-conspirator Lonnell Glover's[3] truck and related

testimony about those conversations (the "truck bug" evidence); (5) the admission into evidence

of FBI Agent Bevington's lay opinion testimony explaining conversations recorded by the truck

bug and by the wiretap on Suggs' cell phone; (6) the jury's exposure to the "overwhelming" odor

of PCP; and (7) the Court's response to a jury note.  In addition, both Glover and Price claim that

even if no claim succeeds individually, the cumulative impact of counsel's mistakes entitles them

to relief.

Of these claims, two -- the claim based on the response to the jury note and the claim

based the jury's exposure to the odor of PCP -- were also raised by Suggs and were denied for

reasons that are equally applicable here.  *See Suggs § 2255 Opinion*, 2015 WL 7566658, at *9-

11.  The Court will not repeat that analysis here, but rather incorporates by reference the analysis

and conclusions set forth in its earlier decision.  The remaining claims, including any additional

facts necessary for an understanding and analysis of each claim, are addressed below.[4]

---

[3] To avoid confusion with defendant Ernest Glover, his brother, the Court will use Lonnell Glover's full name throughout this Memorandum Opinion.

[4] "A district judge must grant a prompt hearing under § 2255 unless 'the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief.'" *United States v. Pollard*, 959 F.2d 1011, 1030 (D.C. Cir. 1992) (quoting 28 U.S.C. § 2255(b)). "The decision whether to do so is committed to the district court's discretion." *Id*. at 1030–31; *see also United States v. Morrison*, 98 F.3d 619, 625 (D.C. Cir.1996) ("[A] district judge's decision not to hold an evidentiary hearing before denying a § 2255 motion is generally respected as a sound exercise of discretion when the judge denying the § 2255 motion also presided over the trial in which the petitioner claims to have been prejudiced.") "Only where the § 2255 motion raises 'detailed and specific' factual allegations whose resolution requires information outside of the record or the judge's 'personal knowledge or recollection' must a hearing be held." *Pollard*, 959 F.2d at 1131 (quoting *Machibroda v. United States,* 368 U.S. 487, 495 (1962)).  Here, although several of the issues raised are not insubstantial, they do not raise factual allegations outside of the record that require a hearing.

## ANALYSIS

### I.      LEGAL STANDARDS

#### A.      Section 2255

Section 2255 provides that "[a] prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). In general, "claims not raised on direct appeal may not be raised on collateral review unless the petitioner shows cause and prejudice," but "an ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal." *Massaro v. United States*, 538 U.S. 500, 504 (2003).

#### B.      Ineffective Assistance of Counsel

The Sixth Amendment guarantees a criminal defendant the right to the effective assistance of counsel at trial and on appeal. *Strickland v. Washington*, 466 U.S. 668 (1984). In order to establish ineffective assistance of counsel, a defendant "must show that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Id.* at 687. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding, if the error had no effect on the judgment." *Id.* at 691. Thus, "[f]ailure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Id.* at 700. A counsel's performance is deficient if it "fell below an objective standard of reasonableness" under "prevailing professional norms." *Id.* at 688. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's

challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. As for establishing prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*; *see also Harrington v. Richter*, 562 U.S. 86, 112 (2011) (A "reasonable probability" means that "[t]he likelihood of a different result must be substantial, not just conceivable.") In assessing prejudice, courts must determine "if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Strickland*, 466 U.S. at 696; *see also Wong v. Belmontes*, 558 U.S. 15, 27 (2009) ("*Strickland* places the burden on the defendant, not the [government], to show a 'reasonable probability' that the result would have been different." (quoting *Strickland*, 466 U.S. at 694)).

## II.     GLOVER'S COUNSEL'S ALLEGED FAILURE TO ADEQUATELY INVESTIGATE HIS CASE

Glover claims that his trial counsel failed to adequately investigate his case because he failed to learn that Glover was a long-time user of and addicted to heroin, and thus he failed to "present this line of available defense." (Glover Supp. at 38.) A failure to investigate can constitute ineffective assistance of counsel. *See Strickland*, 466 U.S. at 691 ("counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary"). "[T]o show prejudice, a defendant basing an inadequate assistance claim on his or her counsel's failure to investigate must make 'a comprehensive showing as to what the investigation would have produced. The focus of the inquiry must be on what

information would have been obtained from such an investigation and whether such information, assuming its admissibility in court, would have produced a different result.'" *United States v. Askew*, 88 F.3d 1065, 1073 (D.C. Cir. 1996) (quoting *Sullivan v. Fairman*, 819 F.2d 1382, 1392 (7th Cir.1987)).   Here, however, the record establishes that Glover's trial counsel knew of his heroin addiction, and he made use of that fact throughout the trial.  (*See, e.g.*, 2/19/08am Tr. at 48 ("My client has had some problems in his life. . . .  My client has struggled with an addiction to heroin as well. The evidence is going to show that also."); *see also* 2/19/08am Tr. at 50-51 ("But you are going to hear evidence that this man has struggled with a heroin addiction for some time.").)  Thus, Glover's claim that his counsel failed to investigate and learn of his heroin addiction is clearly contradicted by the record.  In addition, to the extent that Glover is suggesting that his trial counsel should have utilized this information differently, he fails to suggest any alternative use, much less one that would render trial counsel's choice outside the realm of reasonable strategic alternatives.  Accordingly, the Court rejects Glover's claim of ineffectiveness based on an alleged failure to investigate.

## III.    PRICE'S COUNSEL'S ABSENCE FROM THE COURTROOM

Price claims that his counsel was ineffective because he failed to raise a Sixth Amendment objection to the proceedings that were held while he was absent from the courtroom.

During the trial, Price's counsel fell ill and was unable to attend court for a day.  (Minute Entry, Mar. 3, 2008.)  In his absence, no witnesses were called to testify.  However, the Court did have the jury go through their exhibit books to make sure they were up-to-date (*see* 3/3/08am Tr. at 19-37), and, out of the jury's presence, addressed several issues with counsel for Price's co-defendants, such as scheduling the remaining witnesses and possible stipulations (*id*. at 3-19, 37-79).  The Court also distributed to counsel who were present its proposed revisions to the

conspiracy jury instruction for counsel to review.  (*Id.* at 13-14.)  It briefly explained some of the changes it had made and advised counsel that it would "take up substantive objections" to its proposed revision after Price's counsel was "back."  (*Id.* at 43.)  The next day, when Price's counsel was back in court, the Court confirmed with all counsel that there was nothing further to address with regard to the jury instructions.  (*See* 3/4/08am Tr. at 66.)  Trial testimony finished later that same day, and the Court instructed the jury.  After it finished with the instructions, the Court again asked counsel whether there was anything further for it to address, and all counsel responded that there was not.  (*See* 3/4/08pm Tr. at 40.)

The Sixth Amendment guarantees a defendant's right to have counsel present "at all critical stages of the criminal process."  *Iowa v. Tovar,* 541 U.S. 77, 80 (2004); *see United States v. Cronic*, 466 U.S. 648, 653–654 (1984).  If a defendant's counsel is absent at a "critical stage," that is a *per se* Sixth Amendment violation.  *Woods v. Donald*, 135 S. Ct. 1372, 1375-76 (2015); *Cronic*, 466 U.S. at 659.  A "critical stage" is one that "h[olds] significant consequences for the accused."  *Bell v. Cone*, 535 U.S. 685, 696 (2002); *see also Van v. Jones*, 475 F.3d 292, 313 (6th Cir. 2007) (critical stage if "there was a reasonable probability that [the defendant's] case could suffer significant consequences from his total denial of counsel at the stage").

Price contends that his counsel was absent at a "critical stage" because "substantive issues were discussed," in particular the Court's proposed revisions to the conspiracy instruction.[5]  (Price Mot. at 23.)  A close review of the record confirms that Price's counsel was

---

[5] The United States first argues that Price is precluded from raising this claim because it was already decided on direct appeal.  *See, e.g.*, *United States v. Greene*, 834 F.2d 1067, 1070 (D.C. Cir. 1987) ("a court may decline to review issues raised in a section 2255 motion that have already been decided on direct review").  On appeal, Price's appellate counsel argued that it was "plain error" under the Sixth Amendment for the trial court to proceed as it did in the absence of Price's trial counsel.  (Brief of Appellants at 1, *United States v. Ernest Glover*, Nos. 08-3083

not absent for a "critical stage" of the proceedings.  As the transcript from that date confirms, the Court was well-aware of the importance of not addressing any substantive issues that pertained to Price in the absence of Price's counsel.  (*See, e.g.*, 3/3/08am Tr. at 13 ("I can't[,] obviously[,] proceed without [Price's counsel]."); *id*. at 54-55 ("I can't take it up without him.").)  More importantly, it also confirms that the discussion that took place that day in court pertaining to the conspiracy instruction or to any other matter was not substantive.  Finally, Price's counsel had ample opportunity, when he returned to court the following day, to raise objections to the conspiracy instruction, but he did not do so.  *See Van v. Jones*, 475 F.3d at 313 ("perhaps the best way" of determining whether a proceeding is a critical stage is "to ask whether [the defendant] had any opportunity, subsequent to the [proceeding], to recover or exercise whatever privilege he lost at the hearing").  Accordingly, as Price was not deprived of counsel at a critical stage of the proceedings, there was no Sixth Amendment violation.

## IV.   EVIDENTIARY CLAIMS

The three remaining claims of ineffective assistance all pertain to evidence that defendants contend should not have been admitted at trial: the items seized during the search of Glover's residence; portions of Agent Bevington's lay opinion testimony; and the truck bug

---

(D.C. Cir. Apr. 19, 2011); *see* Fed. R. Crim. P. 52 ("(b) Plain Error. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.").  The Court of Appeals rejected this claim, but did not explain its reasoning.  *See United States v. Ernest Glover*, 681 F.3d 411, 424 (D.C. Cir. 2012) (rejecting all arguments not expressly addressed).  Although unlikely, it is at least theoretically possible that the Court of Appeals concluded that trial counsel's failure raise to a Sixth Amendment objection at trial was not plain error for reasons that would not preclude a claim of ineffective assistance on that ground.  *See United States v. Olano*, 507 U.S. 725, 732 (1993) ("Rule 52(b) leaves the decision to correct the forfeited error within the sound discretion of the court of appeals, and the court should not exercise that discretion unless the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." (internal quotations omitted)).  Accordingly, the Court will consider the merits of this claim.

evidence.  To prevail on an ineffectiveness claim premised upon counsel's failure to file a

motion to suppress or to object to the admission of evidence at trial, a defendant must at a

minimum establish that the evidence was, in fact, wrongfully admitted.  *See, e.g.*, *United States*

*v. Wood*, 879 F.2d 927, 934 (D.C. Cir. 1989); *see also Kimmelman v. Morrison*, 477 U.S. 365,

375 (1986).  Accordingly, the Court will consider first whether any of the challenged evidence

should have been excluded and, if any of the evidence was inadmissible, whether its admission

was prejudicial to Glover or Price.

### A.   ADMISSIBILITY OF EVIDENCE SEIZED DURING THE SEARCH OF GLOVER'S RESIDENCE

 On June 19, 2007, the police conducted a search of Glover's residence.  During that

search, it seized a number of items, including cash, a digital scale, a $1 bill with heroin on it,

little baggies (one with heroin in it), two shoe boxes filled with small glass bottles and tops, two

turkey basters, two eye droppers, a juice bottle with 178.1 grams of PCP; 2 vanilla extract bottles

containing 6.2 grams of PCP, two funnels, a turkey baster, a shotgun, a rifle, and boxes of

ammunition.  No motion to suppress was filed, and the seized items were introduced into

evidence at trial.  (*See* 2/21/08pm Tr. at 52-72 (testimony of FBI Agent Tim Ervin).)  Glover

now claims that this evidence was seized in violation of the Fourth Amendment because the

warrant authorizing the search had expired.

To support his claim that the warrant authorizing the search had expired, Glover has

submitted of a copy of a warrant that was issued on June 8, 2007, and that expired on June 18,

2007, one day before the search occurred.  (*See* Glover Supp., Ex. A.)  However, a second

warrant was obtained on June 15, 2007, and that warrant did not expire until June 25, 2007.  (*See*

2d Gov't Resp. at 12-13 & Ex. A.)   More importantly, the first warrant was returned as

unexecuted, while the "return of warrant" from the second warrant shows that it was the warrant

pursuant to which the search was conducted.  (*Id.*, Ex. A, at 2.)  Accordingly, Glover's claim that

the search of his residence was carried out pursuant to an expired warrant is meritless.[6]

## B.     ADMISSIBILITY OF FBI AGENT BEVINGTON'S TESTIMONY

Agent Bevington testified throughout defendants' trial, introducing into evidence over 80

conversations recorded by the wiretap on Suggs' cell phone and five conversations recorded by

the truck bug and, occasionally, he gave his opinion as to the meaning of those recorded

conversations.  *See Suggs § 2255 Opinion*, 2015 WL 7566658, at *1.  As set forth in greater

detail in the *Suggs § 2255 Opinion*, 2015 WL 7566658, at *2, *5, to the extent Agent

Bevington's opinion was based on his having listened to all of the interceptions, not just those

that were introduced into evidence, or based on knowledge he had gained over the course of the

investigation, the admissibility of his testimony was called into question when the Court of

Appeals held in a related case that Agent Bevington's testimony had exceeded the scope of

permissible lay opinion testimony under Federal Rule of Evidence 701.  *See United States v.*

*Hampton*, 718 F.3d 978. 984 (D.C. Cir. 2013).  In light of *Hampton*, Glover and Price now argue

that on several occasions counsel should have objected to Agent Bevington's testimony as

violating Rule 701.

Many of defendants' challenges to Agent Bevington's testimony were addressed and

rejected in the Suggs' Opinion.  Thus, as explained therein, there was no Rule 701 error in Agent

Bevington's testimony explaining the meaning of Suggs Activations 89, 2093, or 2227, *see*

*Suggs § 2255 Opinion*, 2015 WL 7566658, at *5 & nn.13, 14, and if there was an error in Agent

---

[6] Having rejected Glover's claim on this ground, the Court will not address the government's
suggestion that even if the warrant had expired, a motion to suppress would have been denied
pursuant to the good faith exception established in *United States v. Leon*, 468 U.S. 897, 918
(1984).  (*See* 2d Gov't Resp. at 13 n.13.)

Bevington's testimony about Suggs Activations 199, 200, and 248, it was largely nullified by defense counsel's cross-examination and thus counsel's failure to object could not constitute deficient performance, *see Suggs § 2255 Opinion*, 2015 WL 7566658, at *5 & n.14.  Defendants' remaining challenges have similar problems.

First, defendants argue that Agent Bevington should not have been allowed to testify that Price was known by the nickname "Brother" (*see* 2/27/08am Tr. at 96 (re Suggs Activation 186); 2/27/08pm Tr. at 22 (re Truck Bug Activation 604)) because his earlier testimony indicated that he had acquired that knowledge "*during the course of the interceptions*" (2/27/08am Tr. at 93 (emphasis added)).  Although on the surface it appears that the Agent Bevington's opinion might have been based on interceptions that were not played for the jury, the rest of the sentence makes it clear that he is basing his opinion on a conversation that was in fact played for the jury. *Compare id*. at 93 (Bevington testifying that he knew "Brother" was a nickname for Price because "Mr. Suggs and Ernest Glover spoke about Mr. Price and referred to him as Helery Price, Brother Price") *with* Suggs Activation 2083 (recorded conversation between Suggs and Glover that was played for the jury during which Suggs refers to Price by name and also as Bro/Brother/Old Brother Price).  In addition, even if Agent Bevington's testimony somehow violated Rule 701, counsel's failure to object caused no prejudice given that other admissible evidence, such as the contact list from Suggs' cell phone, established that Price's nickname was Brother.  *See also United States v. McGill*, No. 06-3190, 2016 WL 790413, at *19 (D.C. Cir. Mar. 1, 2016) (no prejudice where "admissible evidence confirmed" "problematic" testimony).

Second, defendants challenge Agent Bevington's testimony about the following exchange between Suggs and Glover:

Glover (talking about "Brother"):

Man, don't want to work a job, man, don't want to do nothing, Ap.  Just want to
walk around, look slick, talk slick and gamble.  You know, that man ain't trying
to do nothing concrete and serious.

Suggs (in response):

He gotta get something to cover him up though man.

(Suggs Activation 186.)  According to Agent Bevington's testimony, what Suggs meant was that

"Mr. Price needs to have a job so he appears to be getting money legitimately."  (2/27/08am Tr.

at 96-97).  Defendants contend that Agent Bevington "relied on his knowledge of the entire

investigation and having listened to all the calls to give him what he called 'context' to make this

[] conclusion."  (Price Mot. at 16 (quoting 2/19/08pm Tr. at 55).)  However, simply asserting

something does not make it true.  As there is nothing in Agent Bevington's testimony itself that

suggests it was based on anything that was not available to the jury, and as his testimony appears

to be a perfectly plausible interpretation of the actual words used in the conversation, the Court is

not persuaded that there was a Rule 701 error, much less an error sizeable enough that counsel

could be faulted for failing to object to this testimony.

Third, defendants challenge Agent Bevington's testimony that during two of the truck

bug conversations (Truck Bug Activations 186 and 706), the parties (Lonnell Glover and Suggs

in the first conversation and Lonnell Glover and Cornell Glover in the second one) are talking

about Ernest Glover selling PCP.   (*See* 2/20/08am Tr. at 74-76; 2/21/08pm Tr. at 11-12.)  Again,

though, there is nothing in the Agent Bevington's testimony to suggest that his opinion is based

on information that was not before the jury, except to the extent it was based on his expert

knowledge of PCP distribution in the District of Columbia.  (*See* 2/21/08pm Tr. at 11-12

(explaining that reference to having "16" meant 16 ounces of PCP).)  He was not interpreting

any other "coded" language, and his testimony appears to be a perfectly plausible interpretation

12

of the actual words used in the conversation.   Thus, the Court again finds no Rule 701 error and, even if it did, it would not be the type of error that counsel could be faulted for failing to raise an objection to.

Finally, defendants challenge Agent Bevington's testimony on cross-examination about what Suggs and another co-defendant (James Parker) could have meant when they were talking about "getting together." (2/21/08am Tr. at 36.)  Defense counsel asked Agent Bevington to admit that he couldn't say that "they weren't getting together the next day to place bets or gamble," and Agent Bevington responded that although he could not "say that definitively . . . *based on our investigation, all of the calls*, I believe it would be something different." (*Id.* (emphasis added).)  Given that this answer was in response to defense counsel's question and that the testimony added nothing to the case against defendants, counsel cannot be faulted for failing to object to this testimony.

Accordingly, although Agent Bevington's testimony as a lay opinion witness created the potential for Rule 701 violations, the Court rejects defendants' claim that any actual violations occurred or, even assuming that a violation occurred, it was so de minimis that counsel's failure to object cannot be deemed a deficient performance.[7]

## C.   ADMISSIBILITY OF TRUCK BUG EVIDENCE

On March 19, 2007, the government filed an application seeking authorization under Title III to install a bug in Lonnell Glover's truck.  The supporting affidavit from FBI Special Agent Ryan Pardee identified Glover and Price as persons who were "participat[ing]" in an

---

[7] Having reached this conclusion, the Court need not address the government's contention that, even if the testimony should have been excluded, counsel's failure to object could not constitute deficient performance because *Hampton* was decided after the appeals in the present case were final.

ongoing conspiracy to distribute PCP in the District of Columbia and who "have used, are using, and will continue to use the vehicle described herein [Lonnell Glover's truck] in connection with the above-described offenses."  (Aff. ¶¶ 5-6.)  The affidavit further stated that there was "probable cause to believe [Glover, Price, and others] are committing, and will continue to commit, offenses involving drug trafficking, and are using cellular telephone conversations and oral communications in and within the vicinity of the target vehicle to promote, manage, establish, and carry out unlawful activity and to facilitate the promotion, management, establishment, and carrying on of said unlawful activity" (Aff. ¶ 13), and, moreover, that there was "probable cause to believe the known likely interceptees" would include Glover and Price. (Aff. ¶ 14.)

The court granted the application, authorizing installation of the truck bug for a period of 30 days.  In the order granting the application, the court found that there was probable cause to believe that Glover, Price, and others, were part of a conspiracy to distribute drugs in the District of Columbia and that the truck bug would intercept incriminating oral communications as to their role in that conspiracy.  Two 30-day extensions were sought and granted, extending the truck bug's operation until June 19. 2007.  Both extension requests were supported by affidavits which again named Glover and Price as targets of the investigation generally and the truck bug specifically.

At trial, the government introduced into evidence five conversations recorded by the truck bug: three conversations between Lonnell Glover and Suggs; one conversation between Lonnell Glover and Cornell Tony Glover; and one conversation between Lonnell Glover and Christian Donaldson.  Although neither Glover nor Price was a party to these conversations, two of the conversations incriminated Glover and two incriminated Price.  As explained in greater

14

detail in the *Suggs § 2255 Opinion*, 2015 WL 7566658, at \*1-3, the Court of Appeals

subsequently held, in a related case against Lonnell Glover, that under Title III the warrant

authorizing installation of the truck bug was "facially insufficient" and that, in that case, none of

the conversations recorded by the truck bug should have been admitted into evidence. *United*

*States v. Lonnell Glover*, 736 F.3d 509, 513-14 (D.C. Cir. 2013) ("Suppression is the mandatory

remedy when evidence is obtained pursuant to a facially insufficient warrant.").[8]  Relying on that

decision, Glover and Price now claim, for the first time, that the truck bug evidence should not

have been admitted against them due to the facial insufficiency of the underlying warrant.[9]  The

government necessarily concedes the facial insufficiency of the truck bug warrant, but it

---

[8] Section 2515 of Title III provides that "[w]henever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any . . . proceeding . . . if the disclosure of that information would be in violation of this chapter."  18 U.S.C. § 2515.

[9] Before trial, Suggs' counsel filed a motion to suppress the truck bug evidence on the ground the application for the truck bug "failed to make the required demonstration of necessity." (Mot. to Suppress Truck Bug Evidence, Jan. 22, 2008 [ECF No 132].)  The motion was denied. (Mem. Op. at 6, Feb. 5, 2008 [ECF No. 334].)  No other motions pertaining to the truck bug evidence were filed in the above-captioned case and no issues were raised on appeal.

In a subsequent case before Judge Hogan, *United States v. Lonnell Glover*, No. 07-cr-0153, Lonnell Glover filed several motion to suppress the truck bug evidence.  His first motion argued that the order authorizing the interceptions was "overly broad" and that the affidavit failed to establish "necessity" for the bug.  (Motion to Suppress at 3-7, *United States v. Lonnell Glover*, No. 07-cr-153, Aug. 4, 2008 [ECF No. 291 & 293 (Amended Motion)].)  His second motion sought to suppress the tracking information obtained from the truck bug (but not the intercepted communications) on the ground that the bug was unlawfully installed outside the jurisdiction of the issuing court because the order authorizing the bug was signed by a judge in the District of Columbia, but the bug was installed in the District of Maryland.  (Motion to Suppress, *United States v. Lonnell Glover*, No. 07-cr-0153, Aug. 4, 2008 [ECF No. 292].)  Judge Hogan denied both motions.  (Minute Entry, Sept. 10, 2008 (ECF No. 292 heard and denied in open court) (Tr. at 23); Memorandum Opinion and Order, Oct. 23, 2008 [ECF No. 362 & 363 (denying ECF No. 293).)  Judge Hogan's rulings as to the admissibility of the truck bug evidence were adopted by this Court in a trial involving Lonnell Glover, *see United States v. Lonnell Glover*, No. 09-cr-0129, which was the case in which the Court of Appeals held that the truck bug warrant was facially insufficient.

disagrees that the evidence was inadmissible, arguing that any motion to suppress filed by

Glover or Price would have been denied for lack of standing.  In the alternative, they contend

that even if the evidence should have been excluded, defendants were not prejudiced by its

admission.

> 1. **Standing**

Under Title III, "[a]ny *aggrieved person* . . . may move to suppress the contents of any

wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom,

on the grounds that . . . (ii) the order of authorization or approval under which it was intercepted

is insufficient on its face."  18 U.S.C. § 2518(10)(a) (emphasis added).  An "aggrieved person" is

defined as "a person who was a *party* to any intercepted wire, oral, or electronic communication

or a *person against whom the interception was directed*."  18 U.S.C. § 2510(11) (emphasis

added).  Thus, to have standing to seek suppression of Title III evidence, a defendant must

satisfy the definition of an "aggrieved person."  *See* S. Rep. No. 90-1097, 1968 U.S.C.C.A.N.

2112, 2179-80 ("This definition defines the class of those who are entitled to invoke the

suppression sanction of section 2515 . . . through the motion to suppress provided for by section

2518").

Neither Glover nor Price was "a party" to any of the truck bug conversations, but they

argue that they are "aggrieved persons" because they are "person[s] against whom the

interception was directed."  Specifically, they argue that the truck bug was "directed" against

them because they were identified in the Title III application and in the order authorizing

installation of the truck bug as targets of the criminal investigation generally and as targets of the

truck bug itself.  The government concedes that Glover and Price are named as "targets" in the

truck bug application and in the order, but maintains that the meaning of "directed against" in the

definition of "aggrieved persons" should be read more narrowly and be limited to persons whose privacy is actually invaded by the interception.

This dispute over the meaning of "aggrieved person" is not easily resolved.   Defendants' proposed interpretation makes sense if one considers only the ordinary meaning of the statutory text.  Glover and Price are, as the government concedes, named targets of the truck bug; so to then say that they are not persons whom the truck bug is "directed against" would seem to ignore the ordinary meaning of those words.  However, the legislative history of Title III establishes that the definition of "aggrieved person" therein was "intended to reflect existing law" of standing under the Fourth Amendment.  S. Rep. No. 90-1097, 1968 U.S.C.C.A.N. at 2180; *see also Alderman v. United States*, 394 U.S. 165, 175 n.9 (1969) (in Fourth Amendment case about electronic eavesdropping, the Court noted the recent enactment of Title III and the legislative intent that its definition of "aggrieved person" "should be construed in accordance with existent standing rules").[10]  What that means for the present dispute, though, is not obvious.

At the time Title III was enacted, the "existing law" of Fourth Amendment standing, as referenced in the Senate Report, was the Supreme Court's decision in *Jones v. United States*, 362 U.S. 257 (1960).  In *Jones*, the Court held that

> In order to qualify as a person aggrieved by an unlawful search and seizure, one must have been a victim of a search and seizure, one against whom the search was directed, as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search and seizure directed at someone else.

---

[10] In *Alderman*, the Supreme Court rejected the contention that coconspirators or codefendants should be accorded standing to raise a Fourth Amendment violation based solely on the introduction of damaging evidence.  *Alderman*, 394 U.S. at 171-72 ("The established principle is that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence.  Coconspirators and codefendants have been accorded no special standing.").

*Id.* at 261.[11]  Subsequently, in *Rakas v. Illinois*, the Supreme Court held that a passenger in an automobile had no standing to challenge the search on the ground that he was a "target" of the search, absent a property or possessory interest in the automobile searched or an interest in the property seized.  439 U.S. 128, 133-34 (1978).  In reaching its decision, the Court "expressly reject[ed]" any interpretation of *Jones* that suggested that the "victim of a search and seizure" and "one against whom the search was directed" are not coextensive.  Although *Rakas* was decided long after Title III's enactment, it sets forth the Supreme Court's interpretation of *Jones*, which is binding on this Court.  Thus, the Court will assume that *Rakas* limits the permissible interpretation of the phrase "directed against" in Title III to persons who are "victims" of the search.  That said, the Court does not agree with the government that *Rakas* is dispositive.  Although the overlapping nomenclature is undeniably confusing, the "target" theory rejected in *Rakas* is not the same as the "target" theory offered by defendants; nothing in *Rakas* precludes the conclusion that the named "target" of a wiretap is a "victim" of that search and thus a person against whom that wiretap is directed.

As for other controlling precedent, there is only the D.C. Circuit's decision in *United States v. Williams*, 580 F.2d 578 (D.C. Cir. 1978).  In *Williams*, the question was whether defendants had standing to move to suppress wiretap evidence on the ground that the application for the wiretaps they sought to suppress was based on evidence from earlier admittedly illegal wiretaps.  The Court held that defendants would have standing only if they could establish their standing to challenge the earlier illegal wiretaps, which they had not done.  The Court observed:

---

[11] In *Jones*, the defendant had challenged the search of an apartment where he was not the owner, but he was staying there with the permission of the owner.  The Supreme Court concluded that the defendant had standing because he was "one against whom the search was directed."  *Jones*, 362 U.S. at 261.

18

> Before an accused may be heard to complain that prosecution evidence should be suppressed because it was come by illegitimately, he must first make out his standing, which generally entails a demonstration that his own interests were affected by the challenged search or seizure. *With particular regard to electronic eavesdropping, the accused must show that it was directed at Him, that the Government intercepted His conversations or that the wiretapped communications occurred at least partly on His premises*. Unless he can establish one of these events, it is legally irrelevant that the surveillance was unlawful.

*Id*. at 583 (emphasis added). The Court then held that the defendants did not have standing because they had "failed to carry their threshold burden of demonstrating that any of their conversations were intercepted, and they urge neither of the other two traditional grounds of entitlement to records of wiretapped communications for use at a taint hearing." *Id*. at 584-85. Although both defendants and the government claim that *Williams* supports their position, the Court is not persuaded by either argument. The government argues that *Williams* should be read as defining "directed at Him" as limited by the next phrase: "that the Government intercepted His conversations or that the wiretapped communications occurred at least partly on His premises." Defendants read *Williams* as recognizing standing for three distinct categories of persons: those whom the eavesdropping is "directed at," those whose conversations are "intercepted," and those upon whose "premises" the eavesdropping occurred. While both interpretations are plausible readings of *Williams*, the problem is that neither, as is the case with *Williams* itself, fits with the statutory language, which recognizes two categories of persons with standing: parties and persons against whom the interception is directed. Thus, the Court finds *Williams* to be of little help in answering the question now before it.

Returning to the legislative history of Title III, the Court is struck by the fact that it makes clear that at the time Title III was under consideration, wiretaps were viewed as a new and extreme way for the government to invade a person's privacy, requiring stringent limits on their use:

> Title III has as its dual purpose (1) protecting the privacy of wire and oral communications, and (2) delineating on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized.  To assure the privacy of oral and wire communications, Title III prohibits all wiretapping and electronic surveillance by persons other than duly authorized law enforcement officers engaged in the investigation or prevention of specified types of serious crimes, and only after authorization of a court order obtained after a showing and finding of probable cause.

S. Rep. 90-1097, 1968 U.S.C.C.A.N. 2112, 2224-27.  Indeed, there was strong opposition to its enactment on the ground that it authorized unwarranted invasions of privacy.  *See* Statement of Senator Edward V. Long and Philip A. Hart, 1968 U.S.C.C.A.N. 2112, 2195-96 ("There is no good reason why Congress should join technology in speeding the arrival of Big Brother.  To the contrary, we should continue our historic course of resisting invasions of privacy.").  To address these concerns, one of the requirements of Title III is that the application for a wiretap name all targets of the investigation and all possible interceptees.  *See* 18 U.S.C. § 2518(1)(b).[12]  The Supreme Court later recognized that the purpose of this provision was likely to "identify the person whose constitutionally protected area is to be invaded."  *See United States v. Donovan*, 429 U.S. 413, 427 (1977).  And, while Title III's failure to give standing to a person who was merely "the subject" of an intercepted conversation was acknowledged and decried, *see* Statement of Senator Edward V. Long and Philip A. Hart, 1968 U.S.C.C.A.N. 2112, 2195-96,

---

[12] Section 2518(1)(b) provides that each application for a wiretap order shall include:

> (b) a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including (i) details as to the particular offense that has been, is being, or is about to be committed, (ii) except as provided in subsection (11), a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted, (iii) a particular description of the type of communications sought to be intercepted, (iv) the identity of the person, if known, committing the offense and whose communications are to be intercepted.

18 U.S.C. § 2518(1)(b).

the possibility that the "directed against" language would provide some measure of relief to non-parties was noted, albeit with the caveat that "it will be difficult in many cases to determine that the surveillance was directed against anyone other than the parties to the communication."  *See* Additional Views of Sen. Hart, 1968 U.S.C.C.A.N. 2112, 2234.  All in all, the Court gleans from this legislative history some support for defendants' view.

As for other courts, they have come to conflicting conclusions, often within the same Circuit.  For example, a number of courts have expressly adopted defendants' view that the named target of a wiretap order has standing.  *See, e.g., United States v. Oliva*, 705 F.3d 390, 395 (9th Cir. 2012) (investigators' sworn statement that they believed defendant was using the wiretapped cellular phones gave him standing because it meant that his "conversations were the target of the surveillance" even though defendant did not admit his voice was intercepted); *United States v. Cooper*, No. 09-cr-00156, 2014 WL 3784344, at *10-11 (N.D. Cal. July 31, 2014) (defendant had standing based on wiretap applications and affidavits where "one names [him] as a target interceptee, and the other names [him] as both a target subject and a target interceptee.").[13]  In addition, in a number of other cases, the court's opinion at least implies that

---

[13] *See also United States v. De Leon*, No. 10-cr-188A, 2012 WL 3313072, at *1 (W.D.N.Y. June 15, 2012) (defendant who was "named target and interceptee on the Title III interception orders . . . has demonstrated standing to move against the intercept orders"), report and recommendation adopted, No. 10-cr-188A, 2012 WL 3315993, at *1 (W.D.N.Y. Aug. 13, 2012); *United States v. Degaule*, 797 F. Supp. 2d 1332, 1353 (N.D. Ga. 2011) (standing for defendant who was "listed as a target on each of the wiretap applications filed by the government"); *United States v. Rodriguez*, No. 08-cr-1311, 2009 WL 2569116, at *5 (S.D.N.Y. Aug. 20, 2009) ("defendants who are named targets or interceptees of a wiretap automatically have standing under Title III"); *United States v. Flores*, 2007 WL 2904109, at *16-17 (N.D. Ga. Sept. 27, 2007) ("in order to establish that wiretap efforts 'were directed at' a defendant, the defendant must demonstrate that he or she was named in the wiretap order and not merely allege that he or she falls within the grouping of "others unknown" referred to in the order"); *United States v. Mullen*, 451 F. Supp. 2d 509, 524 (W.D.N.Y. 2006) (defendants "named in each Intercept Order upon which the Government will rely at trial . . . have standing to challenge any or all of those orders"); *United*

the court would find standing for a defendant who was a named target. *See, e.g.*, *United States v. Luis*, 537 Fed. App'x 752, 753 (9th Cir. 2013) (no standing where defendant "was not named in any of the applications and none of his phone calls were intercepted"), *cert. denied*, 135 S. Ct. 394 (2014).[14]  On the other hand, several courts have expressly rejected the suggestion that a named target in a wiretap application has standing, *see United States v. Azano Matsura*, No. 14-cr-388, 2015 WL 5449912, at *2-5 (S.D. Cal. Sept. 11, 2015); *United States v. Salemme*, 91 F. Supp. 2d 141, 381-84 (D. Mass. 1999), *rev'd in part sub nom. United States v. Flemmi*, 225 F.3d 78 (1st Cir. 2000), while others, without directly addressing the issue, have held that a defendant

_States v. Labate_, No. 01-cr-632, 2001 WL 533714, at *12 (S.D.N.Y. May 18, 2001) (defendant "is named as a subject in each of the five electronic intercept orders and thus has standing to suppress all of the intercepted oral communications"); *United States v. Benjamin*, 72 F.Supp.2d 161, 185 (W.D.N.Y. 1999) (defendant has standing to challenge a pager wiretap where he was named in the intercept order and there was probable cause to believe that the defendant's electronic communications would be obtained through the interceptions); *United States v. McKenzie*, No. 09-cr-60711, 2014 U.S. Dist. LEXIS 98060, at *7 (W.D.N.Y. July 18, 2014) (defendant "has standing as a named-interceptee to move to suppress communications intercepted over Warrants Six, Seven, Eight and Nine"), report and recommendation adopted, 2014 U.S. Dist. LEXIS 120491 (W.D.N.Y. Aug. 28, 2014); *United States v. Lavin*, 604 F. Supp. 350, 356 (E.D. Pa. 1985) ("An aggrieved person is a party to intercepted conversations or one named in the order authorizing the wiretap as a party against whom the investigation was targeted."); *United States v. Gambale*, 610 F. Supp. 1515, 1520-22 (D. Mass. 1985) (defendant has standing if "either named in the orders authorizing electronic surveillance at [a certain location] or was a party to conversations intercepted at that location")

[14] *See also United States v. Civella*, 648 F.2d 1167, 1171-72 (8th Cir. 1981) (no standing where "neither defendant] was named as a target in the . . . wiretap application"); *United States v. Fury*, 554 F.2d 522 (2d. Cir. 1977) (no standing for defendant who "was not named in the . . . wiretap order and . . . was not a party to any conversation intercepted during that tap); *United States v. Estrada*, No. 1:06-cr-358, 2010 WL 6434088, at *3-5 (N.D. Ga. Aug. 2, 2010) (no standing where defendant was not intercepted and was not "named as a Target Subject or Named Interceptee in the application or the order"), report and recommendation adopted, No. 1:06-cr-0358-02, 2011 WL 1258481, at *1 (N.D. Ga. Apr. 4, 2011); *United States v. Ramos-Gonzalez*, No. 07-cr-0318, 2010 WL 4181674, at *3-4 (D.P.R. Oct. 25, 2010) ("In order for the Court to conclude that the Defendant was targeted by the wiretap, the accused must be named as such in the order authorizing the interception.");; *United States v. Ragusa*, 586 F. Supp. 1256, 1258 (E.D.N.Y. 1984) (no standing for defendants who were not "named . . . in the wiretap order" or did not "participate in conversations intercepted during the period of this order").

only has standing if his "privacy was *actually* invaded; that is, if he was a participant in an intercepted conversation, or if such conversation occurred on his premises." *United States v. King*, 478 F.2d 494, 506 (9th Cir. 1973) (emphasis added).[15]

On balance, having considered the statutory text, legislative history, and relevant caselaw, the Court finds merit in defendants' argument that the phrase "directed at" in the definition of "aggrieved person" should be read broadly and that the "victims" of a wiretap include those persons who are expressly identified as targets of the wiretap even if their conversations are never actually intercepted. However, given the lack of precedent in this jurisdiction and the persuasiveness of both sides' arguments, the Court will refrain from resolving this thorny issue because, as explained *infra*, even assuming that Glover and Price have standing and that the truck bug evidence was inadmissible, they cannot show that they were prejudiced by the admission of this evidence.

### 2.    Prejudice

Glover and Price both contend that they were prejudiced by the admission of the truck bug evidence because that evidence constituted some of the strongest evidence against them at trial. As explained *infra*, the Court disagrees with defendants' characterization of the excludable evidence and, most importantly, it is persuaded that a jury hearing only the admissible evidence would have reached the same verdict.

To find "actual prejudice" based on the erroneous admission of evidence, the Court must be convinced "that there is a reasonable probability that the verdict would have been different absent the excludable evidence." *Kimmelman*, 477 U.S. at 375; *see United States v. Wood,* 879

---

[15] *See also United States v. Cruz*, 594 F.2d 268, 273 (1st Cir. 1979); *United States v. Savoy*, 883 F. Supp. 2d 101, 106-07 (D.D.C. 2012) (Lamberth, J.); *United States v. Santana*, 218 F. Supp. 2d 53, 55-56 (D.N.H. 2002); *United States v. Martin*, 169 F. Supp. 2d 558, 564-65 (E.D. La. 2001)

F.2d at 934.  The fact that the wrongfully admitted evidence is incriminating is not

determinative.  *See United States v. Weaver,* 234 F.3d 42, 48 (D.C. Cir. 2000) (no prejudice

where "strength of the government's evidence . . . would remain virtually unchanged" even

setting aside testimony tainted by alleged deficiency).  Nor is the fact that the government relied,

as it did in this case (*see, e.g.*, 2/19/08am Tr. at 14 (opening argument); 3/5/08am Tr. at 21

(closing argument)), in part on the inadmissible evidence in making its arguments to the jury.

*See United States v. Morrison*, 98 F.3d 619, 625 (D.C. Cir.1996) ("But the simple fact that the

government used evidence in its closing argument does not prove that the jury found the

evidence compelling or determinative.").  Rather, "[i[n making this determination, a court

hearing an ineffectiveness claim must consider the totality of the evidence before the judge or

jury." *Strickland*, 466 U.S. at 695.  As explained by the Supreme Court,

> Some of the factual findings will have been unaffected by the errors, and factual
> findings that were affected will have been affected in different ways.  Some errors
> will have had a pervasive effect on the inferences to be drawn from the evidence,
> altering the entire evidentiary picture, and some will have had an isolated, trivial
> effect.  Moreover, a verdict or conclusion only weakly supported by the record is
> more likely to have been affected by errors than one with overwhelming record
> support.  Taking the unaffected findings as a given, and taking due account of the
> effect of the errors on the remaining findings, a court making the prejudice
> inquiry must ask if the defendant has met the burden of showing that the decision
> reached would reasonably likely have been different absent the errors.

*Id*. at 695-96.  In addition,

> In making the determination whether the specified errors resulted in the required
> prejudice, a court should presume, absent challenge to the judgment on grounds of
> evidentiary insufficiency, that the judge or jury acted according to law.  An
> assessment of the likelihood of a result more favorable to the defendant must
> exclude the possibility of arbitrariness, whimsy, caprice, "nullification," and the
> like.  A defendant has no entitlement to the luck of a lawless decisionmaker, even
> if a lawless decision cannot be reviewed.  The assessment of prejudice should
> proceed on the assumption that the decisionmaker is reasonably, conscientiously,
> and impartially applying the standards that govern the decision.

*Id*. at 694-95.

Applying this standard to this case, the Court concludes that neither Glover nor Price was prejudiced by the admission of the excludable evidence.  To explain this conclusion, the Court begins with the fact it has already concluded that Suggs was not prejudiced by the wrongful admission of the truck bug evidence or the potentially inadmissible portions of Agent Bevington's testimony that he challenged.  *See Suggs § 2255 Opinion*, 2015 WL 7566658, at *6-8.  Thus, it has already concluded that a jury hearing only the admissible evidence would have found a conspiracy to distribute PCP in the District of Columbia and that Suggs was a participant in that conspiracy, supplying PCP to lower-level distributors.  *See id.*  Against this backdrop, the only remaining question for the Court is whether a jury hearing only the admissible evidence would also find that both Glover and Price were part of this conspiracy to distribute PCP.  As explained *infra*, considering the strength of the admissible evidence and the likely impact of the excludable evidence, the Court believes that it would

**Strength of Admissible Evidence**

This is not a case where the verdict is only "weakly supported" by the admissible evidence.  *See Strickland*, 466 U.S. at 696.  Rather, as the Court of Appeals noted in denying Glover and Price's appellate challenges to the sufficiency of the evidence against them, and specifically to the evidence that they were "parties" to the agreement to distribute PCP, there was "voluminous evidence presented at trial," including "[n]umerous wiretapped conversations linked Glover and Price to Suggs and to the conspiracy," and the evidence seized from Glover's house.  *See Ernest Glover*, 681 F.3d at 423-24 (characterizing defendants' sufficiency challenge as a "fairly weak" argument).  A complete summary of the admissible evidence against Glover and Price is presented in the attached chart that shows the evidence the government had amassed even before the truck bug picked up conversations that incriminated either Glover or Price.

Briefly, that evidence included: a controlled buy of PCP from co-conspirator Parker on January 4, 2007[16]; approximately 80 calls recorded by the wiretap on Suggs' cell phone involving coded conversations with the alleged co-conspirators from January 9, 2007, through April 7, 2007; Agent Bevington's testimony; videotaped surveillance of a meeting between Lonnell Glover and Cornell Tony Glover on January 12, 2007, during which they exchanged a bottle of liquid; surveillance of two meetings between Suggs and Lonnell Glover, one on January 18, 2007, and the other on January 20, 2007; a controlled buy of PCP from Suggs on January 20, 2007; items seized during the search of Suggs' residence (where he lived with his girlfriend, Ngozi Joy) on March 27, 2007, including 7.7 kilograms of PCP; glass bottles with PCP residue and other drug paraphernalia seized from Parker's apartment on May 31, 2007; 184.3 grams of PCP and drug paraphernalia seized from Glover's house on June 19, 2007[17]; and the cell phones and cash seized from Suggs upon his arrest.

The bulk of the evidence against Glover and Price came from the wiretap on Suggs' cell phone. From that wiretap they intercepted multiple calls between Suggs and Glover and between Suggs and Price, in addition to multiple calls with other alleged co-conspirators Parker, Julian Johnson[18] and Glendale Lee.[19]  As noted, the government played 80 of these calls for the jury.

---

[16] Before trial, Parker entered a plea of guilty to one count of conspiracy. (*See* Plea Agreement, Feb. 11, 2008 [ECF No. 151].)  He was sentenced to 102 months imprisonment and five years supervised release. (*See* Judgment, Aug. 11, 2008 [ECF No. 152].)

[17] Although Glover did not raise this issue, the Court has reviewed the affidavit supporting the request for the search warrant for Glover's house to assure itself that even though it cites to evidence acquired from the truck bug, it also included more than sufficient non-truck bug evidence to support a finding of probable cause.

[18] Before trial, the government dismissed without prejudice the charges against Julian Johnson. (*See* Order, Oct. 15, 2007 [ECF No. 58].)

[19] At trial, the jury was unable to reach a verdict as to Lee, resulting in a mistrial. (*See* Minute Entry, Mar. 18, 2008.) At his second trial, Lee was acquitted. (*See* Judgment of Acquittal, May 8, 2008 [ECF No. 211].)

Although none of these conversations expressly mentions PCP, talking instead about "luggage," "hair dryers," "books," "information," "women," "furniture," "apartments," or being "hit" (*see* Activations 173, 181, 191, 199, 200, 205, 248, 1054, 2093), when viewed in context of the other evidence at trial that established that Suggs was a supplier of PCP to lower-level distributors, it is apparent to the Court that a rational jury would have no trouble recognizing that what these calls were really about was Suggs supplying Glover, Price and others with PCP.  More specifically, there are many calls, including calls with both Glover and Price, where Suggs is talking to the other party about trying to arrange a meeting so that Suggs can make a delivery of PCP.  (*See, e.g.*, Activations 167, 173, 175, 183, 199, 200, 248, 292, 340 (re meeting with and/or deliveries to Glover on January 11 and 14, 2007); Activations 205, 226, 244, 384, 534, 564, 596, 606, 621, 623, 628, 843, 5231, 5239, 5255, 6206, 6215, 6225, 6229, 6233, 6245 (re meeting with and/or deliveries to Price on January 12, 14, 15, and 16, 2007, March 9, 2007, and April 3, 2007); Activations 181, 191 (re meeting with and/or delivery to Johnson on January 11, 2007); Activation 712, 6377, 6401 (re meeting with Parker on January 17, 2007, and arranging delivery to Parker's roommate on April 6, 2007); Activations 546, 649, 727, 1163, 1179, 1182, 1283, 6104 (re meeting with and/or delivery to Lee on January 15, 17, 22, and 23, and April 1, 2007).  In one of the more highly incriminating series of calls, Suggs and Price abort their plan to meet due to suspicion that they are under police surveillance.  (*See* Activations 596, 606, 621, 623, 628, 843.)  There are also several calls, including calls with both Glover and Price, where Suggs indicates that he is unable to fulfill a request for PCP because he himself is waiting for a delivery.  (*See* Activation 1135, 1800, 2545 (calls with Glover on January 22 and January 30, 2007, and February 10, 2007); Activations 943, 1121, 3245 (calls with Price on January 19 and 22, 2007, and on February 22, 2007); Activations 1301, 1345 (calls with Lee on January 23 and

24, 2007).   Finally, there are multiple calls where money is discussed in a way that strongly

suggests that Glover and Price are in the business of selling PCP that they have gotten from

Suggs.  (*See* Activation 2227 (call in which Glover complains to Suggs that he hasn't been able

to collect all the money he is owed); Activation 4391 (call in which Glover tells Suggs that he

was ready to make a delivery but that his customers didn't have their money ready); Activation

5443 (call in which Price leaves Suggs a message telling him to answer his phone if he likes

money).

In addition to the above-described evidence, there were two additional pieces of evidence

that specifically incriminated Glover: (1) the PCP and other drug paraphernalia seized from his

house (*see* 2/21/08pm Tr. at 68-72; 2/26/08pm Tr. at 85-88); and (2) the Rule 404(b) stipulation

informing the jury of Glover's prior convictions for PCP distribution.[20]  As defendants point out,

the incriminating value of the evidence seized from Glover's house is lessened by the fact that

Glover was not the only person living in the house, the items were found in the basement, and

---

[20] The stipulation in its entirety stated:

> The parties in this case, the United States and Ernest Glover, through their
> counsel, hereby agree and stipulate, between April 25, 1994, and February 13,
> 1996, a cooperating witness under law enforcement supervision and an
> undercover law enforcement officer made six separate purchases of PCP from
> Ernest Glover inside and in the immediate area of his residence at 47 Randolph
> Place, Northeast.  The total amount of PCP purchased was approximately 1.5
> kilograms and the total purchase price for the six purchases was approximately
> $8500. On April 29, 1996, Mr.  Glover was arrested inside of 47 Randolph Place,
> Northeast, and a search warrant was executed at the residence.  The search
> revealed, among other things, one 46-ounce bottle with a trace amount of PCP in
> the kitchen, and six glass bottles with trace amounts of PCP in the back yard by
> the trash can.  Based on these facts, Mr. Glover pled guilty, in United States
> District Court for the District of Columbia in Criminal Case 96-51, to three counts
> of unlawful distribution of PCP within 1,000 feet of a school in violation of 21
> United States Code Section 860(a).

(2/25/08am Tr. at 42-44).

the only fingerprints recovered were identified as belonging to Cornell Tony Glover, Glover's

nephew.  Nonetheless, it is evidence that the jury could properly consider in finding Glover

guilty.  Similarly, even though the 404(b) evidence was admissible only for the "limited purpose

of assessing whether the government has proven beyond a reasonable doubt that Mr. Glover . . .

knowingly and intentionally committed the offenses charged in the indictment," the jury could

properly use it to dispel any claim by Glover that he was unaware of the PCP in his basement,

especially given its noticeable and distinct odor.  (*See* 3/5/08am Tr. at 29-30 ("When I talk about

knowledge, I'm talking about knowledge that Mr. Ernest Glover knows what PCP looks like, and

he knows what it smells like.  If he was down in that room, in the basement and there was a

smell, a chemical smell that you now know is PCP, you can use the stipulation that he knew it,

too.).)

Having closely reviewed the evidence summarized above and having sat through the trial,

the Court is satisfied that the admissible evidence strongly supported the verdicts against both

Glover and Price.

**Effect of Excludable Evidence**

As for the excludable evidence, the Court does not believe that it was strong enough to

have had a "pervasive effect on the inferences to be drawn from the [admissible] evidence,

altering the entire evidentiary picture."  *See Strickland*, 466 U.S. at 695-96.

The recordings from the truck bug, while far clearer in terms of their subject matter than

the conversations recorded from Suggs' cell phone, were far from the best evidence against

either Glover or Price.  As previously noted, neither Glover nor Price was a party to any of the

truck bug conversations.  Thus, what the jury heard was not Glover or Price talking about PCP,

but Lonnell Glover and someone else talking about selling PCP and during those conversations

saying things that implicated Glover and Price.  Specifically, what the jury heard was: (1) Suggs telling Lonnell Glover about a conversation he had had with Glover, which Agent Bevington testified was a conversation about PCP (Activation 186); (2) Cornell Glover telling Lonnell Glover that "Ap just got 16 for Fish, that there is moving already," which Agent Bevington testified meant that Suggs had supplied Glover with PCP and that Glover was selling it (Activation 706); and (3) Suggs telling Lonnell Glover on two occasions that "Brother" (Price) might be looking for PCP (Activations 91 & 604).  Although incriminating, the Court does not believe that a jury would have given these relatively brief, out-of-court statements by other co-conspirators the weight defendants suggest.  Accordingly, the Court does not believe that the truck bug evidence that incriminated Glover and Price would have had a "pervasive" effect on the inferences that jury drew from all of the other admissible and incriminating evidence.

In conclusion, considering the strength of the admissible evidence as compared to the excludable evidence, the Court is persuaded that a jury hearing only the admissible evidence would have reached the same verdict as a jury that also heard the excludable evidence. Accordingly, defendants have not met their burden of showing a reasonable probability that the jury's verdict would have been different absent the excludable evidence.

## V.   CUMULATIVE ERROR

Glover and Price's final argument is that even if no individual claim of ineffectiveness succeeds, the cumulative effect of individual errors warrants relief on the ground that defendants have been denied due process of law.  (*See* Glover Supp. at 38-39 (citing *Williams v. Taylor*, 529 U.S. 362 (2000) for the proposition that "courts can aggregate ineffective assistance of counsel claims"); Price Mot. at 37 (same).)  It is not clear that defendants' interpretation of *Williams* is correct, but assuming that it is, this claim is rejected because the Court has already concluded that the cumulative impact of the only two possible errors was not prejudicial.

**VI.    CERTIFICATE OF APPEALABILITY**

When a district court enters a final order resolving a motion under 28 U.S.C. § 2255 that

is adverse to the defendant, it must either issue or deny a certificate of appealability.  *See* Rules

Governing Section 2255 Proceedings for the United States District Courts, Rule 11(a). By

statute, "[a] certificate of appealability may issue . . . only if the applicant has made a substantial

showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The Supreme Court has

explained that this standard is met if "reasonable jurists could debate whether . . . the [motion]

should have been resolved in a different manner or that the issues presented were 'adequate to

deserve encouragement to proceed further.'"  *Slack v. McDaniel,* 529 U.S. 473, 484 (2000)

(quoting *Barefoot v. Estelle,* 463 U.S. 880, 893 & n.4 (1983)).  Here, the Court concludes that

both Glover and Price have met this standard with respect to two claims: (1) the claim of

ineffective assistance premised on counsel's failure to object to allegedly inadmissible portions

of Agent Bevington's lay opinion testimony; and (2) the claim of ineffective assistance premised

on counsel's failure to move to suppress the allegedly inadmissible truck bug evidence.

Accordingly, the Court will issue a certificate of appealability for these two claims, but decline

to issue a certificate of appealability for all other claims.

**CONCLUSION**

For the reasons stated above, defendants Helery Price and Ernest Glover's motions to

vacate their convictions pursuant to 28 U.S.C. § 2255 [ECF No. 329] are **DENIED**.  A separate

Order accompanies this Memorandum Opinion.


                                             /s/   *Ellen Segal Huvelle*
                                             ELLEN SEGAL HUVELLE
                                             United States District Judge

Date:  March 31, 2016